## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SEE-MOR OPTICAL OF HEWLETT, INC., on behalf of itself and all others similarly situated, | ) ) ) | No. |
| | ) | CLASS ACTION COMPLAINT |
| Plaintiff, | ) ) | |
| vs. | ) ) | JURY TRIAL DEMANDED |
| TRANSITIONS OPTICAL, INC., ESSILOR INTERNATIONAL SA, ESSILOR OF AMERICA, INC., and ESSILOR LABORATORIES OF AMERICA, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

See-Mor Optical of Hewlett, Inc. ("Plaintiff"), on behalf of itself and all others similarly situated, brings this action under Section 2 of the Sherman Antitrust Act. 15 U.S.C. § 2. The allegations herein are made on information and belief, except those as to Plaintiff, which are made on personal knowledge.

### NATURE OF THE ACTION

1.     This action arises from Defendant Transitions Optical, Inc.'s ("Transitions") unlawful exclusionary conduct in the market for ophthalmic lenses to which photochromic treatment has been applied ("Photochromic Lenses") in the United States ("the Photochromic Lens Market"). This unlawful conduct includes entering into exclusivity agreements with ophthalmic lens manufacturers ("Lens Casters") and wholesale prescription optical laboratories ("Wholesale Labs"), and either terminating or refusing to deal with Lens Casters that carried or attempted to carry competing products. These unlawful practices were recently the subject of a consent decree between Transitions and the Federal Trade Commission in which Transitions agreed to immediately cease and desist from engaging in such conduct.

2.       As hereinafter alleged, Transitions has further maintained and expanded its monopoly in the Photochromic Lens Market though an unlawful conspiracy with the Essilor Defendants (defined below).

3.       Defendants' exclusionary acts, practices, and other unlawful anticompetitive conduct, as alleged in more detail below, foreclosed key distribution channels for existing rivals and impeded market entry by potential rivals into the Photochromic Lens Market.  Defendants' anticompetitive scheme has injured Plaintiff and the proposed Class through higher prices, lower output, reduced innovation, and diminished customer choice.

## JURISDICTION AND VENUE

4.       This action arises under Section 2 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15.

5.       This Court has jurisdiction under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. §§ 1331 and 1337.

6.       Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d).   Defendants reside, transact business, are found, or have agents in this District.  Further, a substantial part of the events or omissions giving rise to the claims alleged occurred in the District.

## PARTIES

7.       Plaintiff See-Mor Optical of Hewlett, Inc. ("See-Mor"), a corporation organized under the laws of the State of New York, had its principal place of business in Hewlett, New York. During the Class Period (defined below), Plaintiff purchased Photochromic Lenses directly from Tri-Supreme Optical LLC, a wholesale ophthalmic laboratory 100% owned and controlled by the Essilor Defendants (defined below).

8.    Defendant Transitions Optical, Inc. ("Transitions"), is a Delaware corporation with its principal place of business in Pinellas Park, Florida. Transitions is 51 percent owned by PPG Industries Inc. ("PPG") and 49 percent owned by Essilor International SA ("Essilor International"), corporate parent of Defendant Essilor of America, Inc. and one of the world's largest lens manufacturers with $3 billion in 2008 worldwide revenues and over $1 billion in 2008 United States revenues. Transitions is the largest producer of photochromic treatments for ophthalmic lenses in the United States.

9.    Defendant Essilor International is a corporation organized under the laws of France. Essilor International is the world's largest manufacturer or ophthalmic lenses. Essilor International owns 49 percent of Transitions and is the ultimate corporate parent of Essilor of America, Inc. and Essilor Laboratories of America.

10.    Defendant Essilor of America, Inc. ("Essilor of America"), is a Delaware corporation with its principal place of business in Dallas, Texas. Essilor of America is a wholly-owned subsidiary of Essilor International, a French corporation. Essilor of America is the largest seller of lenses in the United States, and owns at least two lens manufacturing facilities, in Carbondale, Pennsylvania, and Dudley, Massachusetts.

11.    Defendant Essilor Laboratories of America, Inc. ("Essilor Labs"), is a North Carolina corporation with its principal place of business in Dallas, Texas. Essilor of America and/or Essilor Labs own majority shares in numerous Wholesale Labs that sell Photochromic Lenses at the wholesale level in the United States, including Tri-Supreme Optical LLC. Essilor International, Essilor of America and Essilor Labs are collectively referred to herein as "Essilor" or the "Essilor Defendants."

## UNNAMED CO-CONSPIRATORS

12.     Co-conspirators 1-100 ("Unnamed Co-Conspirators") are Wholesale Labs that sell Photochromic Lenses in the United States and are owned or controlled by the Essilor Defendants.

## INTERSTATE TRADE AND COMMERCE

13.     Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in and shipments of Photochromic Lenses produced in interstate commerce throughout the United States, including within this District.  The unlawful activities of Defendants and the Unnamed Co-Conspirators have been within the flow of interstate and international commerce.

## RELEVANT MARKET

14.     The relevant market is the Photochromic Lens Market.

15.     There are no close substitutes for Photochromic Lenses, and no other product significantly constrains the prices of Photochromic Lenses.  Photochromic Lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), or fixed-tint lenses (*e.g.*, prescription sunglasses).

16.     Each year, U.S. consumers purchase roughly 76 million pairs of corrective ophthalmic lenses.  In 2008, Photochromic Lenses represented approximately 19 percent of all corrective ophthalmic lenses sold in the United States, totaling approximately $630 million in sales at the wholesale level.

## TRANSITIONS HOLDS MONOPOLY POWER IN
## THE PHOTOCHROMIC LENS MARKET

17.     During the Class Period, Transitions possessed monopoly power in the Photochromic Lens Market.  During each of the past five years, Transitions' share of the

Photochromic Lens Market has been at least 80 percent.  In 2008, Transitions' market share was over 85 percent.

18.      Significant and lasting barriers make entry into the Photochromic Lens Market difficult.  These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unfair methods of competition.

19.      Transitions' monopoly power in the Photochromic Lens Market is also reflected by its ability to exclude competitors and to control prices.  The indicia of Transitions' monopoly power include, but are not limited to, Transitions' ability to: (i) coerce Lens Casters to accept exclusive dealing arrangements; (ii) price its products without regard to its competitors' prices; (iii) impose significant price increases; and (iv) withhold a desired product - a low-priced, private label Photochromic Lens - from consumers in the United States, even though Transitions supplies it in other markets.

## FACTUAL BACKGROUND

20.      A Photochromic Lens passes through three stages of distribution before being sold to the consumer: (i) manufacture by Lens Casters using treatments supplied by Transitions, (ii) sale to a Wholesale Lab or Integrated Optical Retailer ("Retailer"), and (iii) sale either to an independent eye care practitioner or directly to the consumer. The Photochromic Lens distribution chain is shown below in Diagram A.

### Diagram A[1]



21.      Essilor is the leading Lens Caster and the owner of the largest Wholesale Lab network. Acting together, during the Class Period, Essilor and Transitions maintained their dominance in the Photochromic Lens Market by exclusionary policies at nearly every level of the Photochromic Lens distribution chain.

### Transitions' Relationship to Essilor

22.      Transitions, formed in 1999, is 51 percent owned by PPG and 49 percent owned by Essilor International. As explained by Richard Rompala, the vice president of PPG's chemicals group, "The joint venture [Transitions] would combine the production, distribution and marketing capabilities of Essilor with the technical expertise in ophthalmic plastics demonstrated by PPG."

23.      Essilor was the key driver in the formation of Transitions, and the mastermind of the monopolistic scheme. Essilor provided the distribution network and marketing expertise

---

[1] The notation "(Essilor)" in the diagram indicates Essilor's position in the distribution chain, and that Essilor is the largest owner of Lens Casters and Wholesale Labs in the United States.

necessary to both create Transitions and exploit its unique position to engage in monopolistic

behavior.  As Rick Elias, Chief Executive of Transitions, stated in a January 2008 interview,

"PPG sold raw materials to the optical lens industry.  But we didn't know about making or

distributing lenses.  We don't make the lens, we apply the photochromic treatment to the lens.

So we developed a strategy to partner with our biggest customer, Essilor International.  They had

the network; we had the technology."

24.     Though Essilor only has a 49% stake in Transitions, it was willing to give up

majority ownership in order to acquire the technology necessary to implement the monopolistic

plan.

25.     Essilor's involvement in Transitions' business is significantly more than merely

that of a typical minority shareholder.  Throughout the Class Period, Essilor has actively

participated in and knowingly assisted and facilitated Transitions' monopolistic conduct as

alleged herein.  For example, according to a recent analysis of the FTC Action by an industry

participant, the anticompetitive actions and exclusive contracts used by Transitions, as herein

alleged, mirror the anticompetitive tactics engaged in earlier by Essilor to attempt to exclude its

competitors from the market.

26.     During its inception in 1999, Essilor directly assisted Transitions with its

distribution needs.  Before 2001, Essilor would hold inventory (lenses) that Transitions would

draw from as needed, apply the treatment, then ship to Lens Casters.  For certain specialty

products, Transitions would apply the photochromic treatment, then ship to the Essilor of

America distribution center, then ship to Lens Casters.

27.     In addition, at least three Essilor officers moved to Transitions to be part of their

management team:

(a)     In January 2003, Guy Jouffroy, the Vice President of Global Engineering at Essilor International, moved to Transitions to become its Executive Vice President of Operations.

(b)     In 2005, Franck Carlier, the Systems Integration Director for Essilor of America, moved to Transitions and became its Global Information Technology Director.  Carlier also previously held positions at Essilor International.

(c)     In 2006, Gretchen Walsh, who had served as Associate General Counsel at Essilor of America for eight years, became General Counsel of Transitions.

28.     Essilor is also inextricably involved in the technological aspects of Transitions' photochromic business.  For example, an international patent application that was filed on June 18, 2009, titled "Photochromic Coating Exhibiting Improved Performance And Reduced Yellowness," lists four applicants: Essilor International, Transitions, and the two U.S. inventors.

29.     Due to Defendants' anticompetitive, exclusionary conduct in the Photochromic Lens Market, Transitions has consistently maintained a 25% annual growth rate in its business.

**Foreclosure of The Lens Caster Distribution Channel**

30.     Lens Casters take certain raw materials and fabricate various types of ophthalmic lenses.  Essilor of America has the largest market share of any Lens Caster in the United States.

31.     Transitions applies photochromic treatments to ophthalmic lenses, and only deals directly with Lens Casters.  Lens Casters provide Transitions with untreated lenses, to which Transitions applies photochromic materials, and then sells the now-Photochromic Lenses back to the Lens Casters who supplied the original lenses, after which the Photochromic Lenses are processed and distributed via the above-referenced distribution chain.

32.     Nearly 100 percent of all Photochromic Lenses are first sold and/or produced by Lens Casters. Attempts to bypass the Lens Casters by fabricating Photochromic Lenses at lower levels of the supply chain (e.g., the Wholesale Labs or Retailers) have largely been abandoned as uneconomical. Transitions engaged in numerous anticompetitive acts and implemented anticompetitive policies to foreclose competitors from dealing with Lens Casters, including the following anticompetitive acts and policies:

        (a)     terminating at least one Lens Caster who attempted to use a competitor's Photochromic Lens products;

        (b)     threatening to terminate any Lens Caster who dealt with Transitions' competitors;

        (c)     entering into written exclusive dealing agreements with Lens Casters, including Essilor of America; and

        (d)     announcing a policy that Transitions would not deal with any Lens Caster that sold or promoted a competing Photochromic Lens.

33.     In 1999, rival Corning Inc. ("Corning") introduced SunSensors, a competitive Photochromic Lens product. Transitions responded to this competitive threat by terminating the first Lens Caster to sell SunSensors lenses, Signet Armorlite, Inc. ("Signet"). In doing so, Transitions sent a clear message to the industry that it would not tolerate competition.

34.     The message was received. No major Lens Caster has been willing to sell the SunSensors plastic Photochromic Lens since Transitions terminated Signet.

35.     Transitions thereafter refused to deal with any Lens Caster that sold or promoted a competing Photochromic Lens. Transitions enforced that exclusionary policy by, among other

things, entering into agreements with certain Lens Casters that expressly require exclusivity, and by publicizing its exclusive dealing policy in the marketplace.

36.     Only one Lens Caster has been able to resist Transitions' coercion and introduce a new Photochromic Lens.  In 2005, Lens Caster Vision-Ease Lens ("Vision-Ease") introduced its own brand of Photochromic Lenses, LifeRx.  Because Transitions refused to deal with Vision-Ease, the upstart lens crafter only was able to keep its LifeRx product on the market by entering into secret negotiations with one of the largest Retailers in the United States, who committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

37.     Lens Casters who might have otherwise developed their own photochromic treatments have learned from the Vision-Ease experience that they cannot do so absent a commitment from a large Retailer to carry the competitive products.  Since Transitions terminated Vision-Ease for introducing LifeRx in 2005, no other Lens Caster has introduced a new line of Photochromic Lenses in the United States.

38.     The appearance of Vision-Ease in the Photochromic Lens Market in 2005, despite the extraordinary efforts required to do so, demonstrates that there is financial incentive to innovate in this industry if a competitor is able to overcome the anticompetitive barriers to entry that Essilor and Transitions have erected.

39.     Because of Transitions' anticompetitive policies, those Lens Casters that did not sign exclusivity agreements with Transitions were effectively precluded from dealing with Transitions' competitors, regardless of whether they had signed exclusivity agreements with Transitions.  This is because Transitions' business accounted for 40 percent or more of most Lens Casters' revenues, and Lens Casters could not afford the risk of losing this revenue stream.

40.     In addition, because many Retailers and Wholesale Labs prefer to buy both clear and photochromic versions of the same lenses, losing the ability to sell Transitions Photochromic Lenses would also significantly impact their ability to sell clear lenses.  Thus, the effect of losing Transitions' business would be devastating to almost any Lens Caster.

41.     As a result of Transitions' policies, Lens Casters that exclusively sell Transitions Photochromic Lenses collectively account for over 85 percent of all Photochromic Lens sales in the United States.

42.     By keeping competitors out of the Photochromic Lens Market, Transitions has been able to charge monopolistic prices for its Photochromic Lenses.

### Foreclosure of The Wholesale Lab and Retail Distribution Channel

43.     Lens Casters sell and distribute Photochromic Lenses alongside clear corrective ophthalmic lenses through two distribution channels: Wholesale Labs and Retailers, each of which represents approximately one-half of the downstream market.

### Wholesale Labs

44.     Wholesale Labs grind lenses according to prescriptions from eye-care practitioners, polish semi-finished lenses, apply certain surface treatments (such as anti-scratch and anti-reflective coatings), and in most instances fit lenses into eyeglass frames and deliver finished eyeglasses to eye-care practitioners.  Wholesale Labs also typically employ a sales force to promote specific lenses to eye-care practitioners.

45.     A Wholesale Lab may be: (i) owned by, controlled by or otherwise integrated with Lens Casters; (ii) owned and operated by optical retail chains that generally provide both laboratory and eye-care practitioner (*i.e.*, ophthalmology, optometrist and optician) services; or (iii) operated independent of any Lens Caster or Retailer.

46.     Photochromic Lens suppliers, such as Transitions, use Wholesale Labs and their sales forces to market their lenses because Wholesale Labs are the most efficient means to communicate with the tens of thousands of independent eye-care practitioners who prescribe Photochromic Lenses.

47.     At least one-half of all Wholesale Labs in the United States – including labs owned by the Essilor Defendants – are owned by Lens Casters that sell only Transitions Photochromic Lenses thereby substantially eliminating access to those labs for rival suppliers of photochromic treatments for ophthalmic lenses ("Photochromic Lens Suppliers").

48.     Transitions has also entered into exclusive agreements with over 100 Wholesale Labs, including 23 of the 30 largest independent Wholesale Labs, to further limit its rivals' ability to access the independent Wholesale Lab distribution channel.

49.     By engaging in exclusive agreements with Lens Casters that own over one-half of the Wholesale Labs in the United States, Transitions has limited the ability of its rivals and potential rivals to promote and sell their Photochromic Lenses to independent eye-care practitioners (*i.e.*, practitioners unaffiliated with retail chains), which buy from Wholesale Labs.

50.     There has been considerable consolidation in the Wholesale Lab distribution channel in recent years as Lens Casters have begun to acquire Wholesale Labs.  Essilor Labs owns numerous Wholesale Labs throughout the United States, and has acquired complete or majority ownership in at least 30 Wholesale Labs between 2006 and 2008 alone.  Essilor Labs is the largest owner and operator of Wholesale Labs in the United states, with over 116 Wholesale Labs.

**Retailers**

51.     Retailers include national, regional and smaller retail chains, and generally provide both eye care practitioner and laboratory services.  They employ their own eye care practitioners who deal directly with consumers.  In addition, Retailers grind and fit lenses into eyeglass frames and deliver the frame with the finished lens to the consumer.

52.     Because Retailers employ their own eye care practitioners, the retail channel is generally a more efficient means for promoting and selling Photochromic Lenses to consumers than comparable efforts through Wholesale Labs.  For example, a decision by the corporate headquarters of one retail chain to buy a specific Photochromic Lens can have an immediate impact on the prescribing behavior of all the practitioners who are employed by that retailer.  The retail channel has also witnessed significant consolidation over the Class Period.

53.     After terminating Vision-Ease for developing and selling a competing Photochromic Lens, Transitions entered into exclusive contracts with over 50 Retailers, including many of the largest retail chains.  Most of these exclusive agreements were long-term and included provisions making termination onerous.  These agreements foreclosed downstream outlets for the sale of Photochromic Lenses and created significant barriers to entry to rival Photochromic Lens Suppliers.

54.     Transitions' actions effectively excluded Vision-Ease, other rivals and potential rivals from an efficient distribution channel, thereby minimizing their entry into the Photochromic Lens Market, deterring potential competitors from attempting to enter the market and effectively preventing Vision-Ease or any other rival photochromic suppliers from restraining Transitions' exercise of monopoly power.

55.     The Essilor Defendants also supply Photochromic Lenses to many Retailers.

- 13 -

**Anticompetitive Bundled Discounts**

56.     Transitions' agreements with Wholesale Labs and Retailers generally provide for discounts only to customers who purchase all or almost all of their Photochromic Lens needs from Transitions.

57.     No other photochromic treatment supplier has a treatment that applies to a full line of ophthalmic lenses.  Transitions' discount structure thus impairs its competitors' ability to compete for sales to those customers, as those customers can neither discontinue nor limit their sales of Transitions' products.

58.     Transitions' bundled discount arrangements erect a significant entry barrier by limiting the ability of rival Photochromic Lens Suppliers to enter the Photochromic Lens Market with new photochromic treatments suitable for anything less than a full line of lenses.  Those arrangements also strengthen the barriers to entry erected by Transitions' policy of requiring that Lens Casters deal exclusively with Transitions.

59.     Transitions' exclusionary practices in dealing with Wholesale Labs and Retailers foreclose its rivals, in whole or in part, from substantial shares of the Photochromic Lens Market at those levels, and thereby increase prices for Photochromic Lenses.

## Essilor Defendants' Participation in the Conspiracy to Monopolize

60.     Throughout the Class Period, Essilor of America exclusively sold Transitions' Photochromic Lenses.  Essilor of America also entered into exclusive agreements with multiple Wholesale Labs and Retailers, which required those purchasers to sell and/or actively promote only Essilor lenses.  These practices, mirroring those engaged in by Transitions, supported and facilitated Transitions' monopoly in the Photochromic Lens Market.

61.     In recent years, Essilor International has consolidated and expanded its interests in the United States.  The Essilor Defendants also facilitated the conspiracy by acquiring

Transitions' competitors, permitting Transitions to gain even greater control over the

Photochromic Lens Market:

> (a)   In April 2010, BOA Holding Co., Inc., a wholly-owned subsidiary of
> Essilor International, completed its acquisition of Signet.  Transitions weakened Signet in 1999
> when it terminated Signet as a distributor of Transitions Photochromic Lenses, following
> Signet's attempt to distribute Corning's competing product, SunSensors.

> (b)   In 2007, Essilor of America acquired a controlling interest in KBco, one of
> the largest polarized lens distributors in the United States.  According Essilor's 2007 Annual
> Report, KBco is a "recognized specialist in polarized lenses for the US ophthalmic optics
> industry," and "markets a broad range of products for retail chains and independent eyecare
> professionals."

62.     At all relevant times after being acquired by or otherwise coming under the

control of one or more of the Essilor Defendants, the Unnamed Co-Conspirators purchased and

sold Transitions Photochromic Lenses on an exclusive or substantially exclusive basis.

However, unlike other Wholesale Labs that entered into exclusive agreements with Transitions,

the Unnamed Co-Conspirators did so in whole or in substantial part to bolster Transitions'

monopoly in the Photochromic Lens Market.

### FTC Action Against Transitions

63.     On March 3, 2010, the FTC issued a complaint against Transitions (the "FTC

Complaint"), as well as a Decision and Order (the "Order").

64.     The FTC Complaint alleged the following, among other things:

> (a)   the relevant geographic market is the United States;

> (b)   there are no close substitutes for Photochromic Lenses, and no other
product significantly constrains the prices of Photochromic Lenses;

(c)     Transitions has monopoly power in the Photochromic Lens Market, having at least 80 percent of that market in each of the past five years and over 85 percent in 2008;

(d)     there are significant and lasting barriers to entry into the Photochromic Lens Market, including: (1) product development costs; (2) capital requirements; (3) intellectual property rights; (4) regulatory requirements; and (5) Transitions' unfair methods of competition.;

(e)     the anticompetitive effects of Transitions' conduct include: (1) increasing the prices and reducing the output of Photochromic Lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Lens Market; (3) reducing innovation; and (4) reducing consumer choice among competing Photochromic Lenses.

65.     The Order generally prohibits Transitions from:

(a)     entering into exclusive dealing arrangements with customers;

(b)     requiring that customers not cooperate with Transitions' competitors;

(c)     providing compensation to customers in exchange for exclusivity;

(d)     providing bulk discounts based on the percentage of Transitions' products sold versus those of competitors; or

(e)     retaliating against customers who attempt to bring a competing product to market.

66.     In a press release issued the same day as the filing of the FTC Complaint, Richard Feinstein, Director of the FTC's Bureau of Competition, stated:

> Transitions crossed the line between aggressive competition and illegal exclusionary conduct. It used its monopoly power to strong-arm key distributors into exclusive agreements and unfairly box out rivals so they could not use these distributors.  Its actions

prevented others from competing on the merits, and consumers were forced to pay more for these lenses as a result. Such conduct runs afoul of the antitrust laws and is unacceptable.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and the following proposed Class:

> All persons or entities that purchased Photochromic Lenses directly from one or more of the Defendants or the Unnamed Co-Conspirators at any time during the period from March 3, 2006 to the filing of this complaint (the "Class Period"). Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all government entities.

68.     The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade or the commerce involved, Plaintiff believes that the members of the Class are geographically dispersed throughout the United States, and that joinder of all members of the Class would be impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, Plaintiff believes that there are at least hundreds of members of the Class, and that their identities can be learned from Defendants' books and records.

69.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class purchased Photochromic Lenses during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and the Unnamed Co-Conspirators. Plaintiff and members of the Class have sustained damage in that they paid artificially inflated prices for Photochromic Lenses during the Class Period due to Defendants' conduct in violation of federal antitrust law as set forth below.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

71.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Photochromic Lens Market is an appropriate relevant market in this case;

(b)     whether Transitions possesses monopoly power in the Photochromic Lens Market;

(c)     whether, through the conduct alleged herein, Transitions willfully acquired, maintained and enhanced its monopoly power in the Photochromic Lens Market;

(d)     whether Transitions entered into exclusionary agreements that unreasonably restrained trade and impaired its rivals in the Photochromic Lens Market;

(e)     the identities of the Unnamed Co-Conspirators;

(f)     whether, through the conduct alleged herein, Defendants and the Unnamed Co-Conspirators conspired to confer, maintain or enhance Transitions' monopoly power in the Photochromic Lens Market;

(g)     whether Defendants and the Unnamed Co-Conspirators conspired to engage in unlawful exclusionary conduct to impair the opportunities of Transitions' rivals in the Photochromic Lens Market;

(h)     whether and to what extent, Defendants' and the Unnamed Co-Conspirators' conduct caused Plaintiff and Class members to pay supra-competitive prices for Photochromic Lenses and thereby suffer antitrust injuries; and

(i)     whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the members of the Class and, if so, the proper measure of damages.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, will achieve substantial economies of time, effort and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

73.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical, rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for members of the Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

**COUNT  I**
**Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:**
**Conspiracy to Monopolize**
**Against All Defendants**

74.     Plaintiff incorporates by reference the preceding allegations.

75.     The Essilor Defendants actively joined in and facilitated Transitions' efforts to acquire, willfully maintain and unlawfully exercise monopoly power in the Photochromic Lens

Market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

      (a)    exercising their ownership and/or control over the Unnamed Co-Conspirators to cause or induce them to substantially limit their purchases and sales of Photochromic Lenses to Transitions Photochromic Lenses;

      (b)    in the case of Essilor of America, entering into agreements that effectively caused or induced its Wholesale Lab customers (other than the Unnamed Co-Conspirators) to purchase and sell only Transitions Photochromic Lenses; and

      (c)    purchasing and selling only Transitions Photochromic Lenses.

76.    Defendants and the Unnamed Co-Conspirators sought to obtain, maintain and enhance Transitions' monopoly power in the Photochromic Treatments Market beginning no later than 1999 when Transitions began entering into and implementing exclusionary contracts with Lens Casters, including Essilor of America, to thwart competition from Corning and other potential rivals.

77.    Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary agreements, with Transitions, with each other, with the Unnamed Co-Conspirators, and with their respective non-conspiring customers, that effectively blocked rival Photochromic Lens Suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing Photochromic Lenses through the Unnamed Co-Conspirators.

78.    Each of the Defendants and the Unnamed Co-Conspirators has committed at least one overt act - such as entering into exclusionary agreements and selling Transitions Photochromic Lenses at supra-competitive prices - to further the conspiracy.

79.     Each of the Defendants and the Unnamed Co-Conspirators intended that the conspiracy to monopolize alleged herein would maintain and enhance Transitions' monopoly power in the Photochromic Lens Market and thereby injure Plaintiff and the Class.

80.     Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the Class consists of paying artificially inflated prices for Photochromic Lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

## COUNT  II
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2:
### Monopolization
### Against All Defendants

81.     Plaintiff incorporates by reference the preceding allegations.

82.     Transitions acquired, willfully maintained and unlawfully exercised monopoly power in the Photochromic Lens Market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

(a)     at the Lens Caster level: (1) adopting and publicly announcing a general policy of refusing to deal with Lens Casters that sell or promote any competing Photochromic Lens; (2) entering into exclusive agreements with certain Lens Casters; (3) threatening to terminate Lens Casters that would not sell Transitions Photochromic Lenses on an exclusive basis; and (4) terminating a Lens Caster that developed a competing photochromic treatment; and

(b)     at the Wholesale Lab and Retailer levels: (1) entering into long-term exclusionary agreements with most major Retailers; (2) entering into agreements with Wholesale Labs requiring that they promote Transitions Photochromic Lenses as their preferred

- 21 -

Photochromic Lens and withhold normal sales efforts for competing Photochromic Lenses; and (3) offering discounts only to customers who sold only or almost only Transitions Photochromic Lenses.

83.     There is no legitimate business justification for Transitions' actions and the conduct through which it maintained its monopoly power in the Photochromic Lens Market.

84.     Transitions has effectively excluded competition from the Photochromic Lens Market, maintained its dominant market share in the Photochromic Lens Market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high levels, and by reaping the benefits of its illegally obtained and maintained monopoly power in the Photochromic Lens Market.

85.     The anticompetitive effects of Transitions' conduct far outweigh any possible procompetitive benefits or justifications.

86.     During the Class Period, the exclusionary and monopolistic conduct engaged in by Transitions, as alleged herein, was directed and controlled by the Essilor Defendants.

87.     Absent the unlawful conduct and the substantial foreclosure and impairment of effective competition caused by such conduct, Transitions, as a rational actor, would have reduced the price it charged to Lens Casters for its photochromic treatment of lenses and/or supplied its low-priced, private label Photochromic Lens (which it offers outside of the United States where it faces increased competition) in response to added unimpaired competition from Corning, Vision-Ease and other rivals and potential rivals (*i.e.*, Wholesale Labs and/or Lens Casters that could have or would have developed their own photochromic treatments). Moreover, had actual or potential Photochromic Lens Suppliers not been substantially foreclosed or stifled by Transitions' anticompetitive conduct from effectively competing in the

Photochromic Lens Market, those competitors and/or potential competitors would have sold much more of their products, gained a larger market share and achieved economies of scale and scope that could have further driven down prices in the marketplace.

88.     Plaintiff and members of the Class have been injured in their business or property by Transitions' monopolization of the Photochromic Lens Market. Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Photochromic Lenses, than they would have paid absent the unlawful conduct alleged herein.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand judgment as follows:

A.     Defendants' actions described herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

C.     That Plaintiff and the Class recover the damages determined to have been sustained by it, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiff and each and every member of the Class;

D.     That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

E.     That Plaintiff and the Class recover their costs of this suit, including attorneys' fees, as provided by law; and

F.     That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

Dated:  April 21, 2010                    Respectfully submitted,

Robert C. Josefsberg (Fla. Bar No. 040856)
Katherine W. Ezell (Fla. Bar No. 114771)
Ramon A. Rasco (Fla Bar No. 0617334)
**PODHURST ORSECK, P.A.**
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: 305.358.2800
Fax: 305.358.2382
rjosefsberg@podhurst.com
kezell@podhurst.com
rrasco@podhurst.com

*Local Counsel for Plaintiff and the Proposed
Class*

Bernard Persky
Hollis Salzman (Fla. Bar No. 947751)
Kellie Lerner
Ryan G. Kriger
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Fax: 212.818.0477
bpersky@labaton.com
hsalzman@labaton.com
klerner@labaton.com
rkriger@labaton.com

**KENNETH A. ELAN, ESQ.**
217 Broadway, Ste. 606
New York, NY 10007
Telephone: 212.619.0261
Fax: 212.385.2707
elanfirm@yahoo.com

*Counsel for Plaintiff and the Proposed Class*